# United States Court of Appeals

### For the Eighth Circuit

_____

No. 20-3065

_____

United States of America

*Plaintiff - Appellant*

v.

Marcus Anthony Mattox

*Defendant - Appellee*

_____

No. 20-3133

_____

United States of America

*Plaintiff - Appellee*

v.

Marcus Anthony Mattox

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: December 17, 2021
Filed: March 4, 2022

_____

Before SMITH, Chief Judge, GRUENDER and KOBES, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Marcus Mattox was convicted of possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1) after the district court[1] denied his suppression motion. The Government and Mattox appeal. The Government challenges the district court's conclusion that Mattox was not an armed career criminal. *See* 18 U.S.C. § 924(e)(1). Mattox challenges the denial of his suppression motion, the sufficiency of the evidence that the gun had been in or affected interstate commerce, and the application of a sentencing enhancement for use or possession of a firearm in connection with another felony offense. We affirm.

**I.**

On September 22, 2018, police officers responded to a 911 call about gunshots at an apartment complex in St. Paul, Minnesota. The officers followed a fresh blood trail and found a loaded Desert Eagle .50-caliber semi-automatic pistol with blood on it and the hammer cocked back in the firing position. The officers learned that a man had been shot in his face and right foot and had been taken to the hospital.

An officer went to the emergency room at the hospital and entered the man's room. The man's bloody clothes were on the floor, and at the officer's request, a nurse took the identification from the clothes. The identification showed the defendant's name, Marcus Mattox. The officer took the clothes, and the next day, an officer went to the hospital and executed a warrant for a DNA swab from Mattox and asked him some questions for a few minutes. Mattox admitted that he was at the scene of the crime and stated that he did not know who shot him. He declined to answer more questions.

---

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

-2-

The police compared Mattox's DNA sample to gun swabs that tested positive for blood. The swabs matched Mattox's DNA sample. The police also obtained video surveillance footage of the shooting. The video shows Mattox exit the apartment building, approach a male and a female at the back of an SUV in the parking lot, appear to draw a firearm, and take a shooting stance. After Mattox drew his gun, the male appeared to shoot at Mattox.

A federal grand jury indicted Mattox on one count of possessing a firearm as a convicted felon. *See* 18 U.S.C. § 922(g)(1). Mattox moved to suppress the evidence seized from his hospital room and the statements he made to the police while hospitalized. The district court denied the motions, adopting the magistrate judge's conclusions that (1) the plain-view exception to the warrant requirement applied to the seizure of Mattox's clothes, and (2) the questioning of Mattox was not a custodial interrogation and his statements were voluntary.

At trial, the jury heard expert testimony that the Desert Eagle handgun found in the parking lot was manufactured in Israel. The jury convicted Mattox of being a felon in possession of a firearm. The district court sentenced Mattox to 106 months' imprisonment and 3 years' supervised release. It applied a four-level enhancement for use or possession of a firearm "in connection with another felony offense," *see* U.S.S.G. § 2K2.1(b)(6)(B), overruling Mattox's objection to the enhancement. The district court denied the Government's request that Mattox be designated an armed career criminal under 18 U.S.C. § 924(e). The Government appeals the denial of the armed career criminal designation, and Mattox challenges the denial of the suppression motions, the sufficiency of the evidence that the gun had been in or affected interstate commerce, and the application of U.S.S.G. § 2K2.1(b)(6)(B).

## II.

We begin with Mattox's challenge to the district court's denial of his suppression motions. "In reviewing a denial of a motion to suppress, we review the district court's findings of fact for clear error, giving due weight to the inferences

police drew from those facts. We review de novo the district court's legal conclusion that reasonable suspicion or probable cause existed." *United States v. Pacheco*, 996 F.3d 508, 511 (8th Cir. 2021). We also review *de novo* whether a statement was given voluntarily, but "we review for clear error the factual findings underlying that determination." *United States v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012) (internal quotation marks omitted).

## A.

We first consider whether Mattox's clothing was taken in violation of the Fourth Amendment. The Fourth Amendment permits an officer to seize an object without a warrant under the plain-view doctrine if "(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *United States v. Vinson*, 805 F.3d 1150, 1152 (8th Cir. 2015). Mattox does not dispute that the second and third conditions are met here. But he argues that the first condition is not met because the police violated his Fourth Amendment rights by entering his hospital room.

We disagree. Whether the police violated Mattox's Fourth Amendment rights by entering the hospital room depends on whether Mattox had an objectively reasonable expectation of privacy in the hospital room. *See United States v. Long*, 797 F.3d 558, 564 (8th Cir. 2015). Our determination of whether an individual had a reasonable expectation of privacy may be informed by state law. *See, e.g.*, *Rambo*, 789 F.2d at 1295-96. True, as Mattox points out, overnight guests in homes and hotel rooms have a reasonable expectation of privacy. *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990); *United States v. Conner*, 127 F.3d 663, 666 (8th Cir. 1997). But that is because hosting overnight guests in homes "is a longstanding social custom that serves functions recognized as valuable by society." *Olson*, 495 U.S. at 98. Being admitted to the hospital for a gunshot wound does not serve the same valuable societal function. In fact, police in Minnesota are expected to show up to hospitals to investigate a gunshot-wound victim like Mattox because Minnesota law requires

-4-

hospitals to report gunshot wounds to the police. *See* Minn. Stat. § 626.52, subd. 2; *United States v. Clancy*, 979 F.3d 1135, 1138 (6th Cir. 2020). The officer who interviewed Mattox testified that he had gone to the hospital in the past to interview victims of gunshot wounds. Accordingly, the Fourth Circuit has recognized that a police officer "lawfully fulfilling his duty to investigate a reported shooting . . . lawfully entered the emergency room of a hospital to interview the victim of the shooting." *United States v. Davis*, 690 F.3d 226, 234 n.13 (4th Cir. 2012). Furthermore, unlike in hotel rooms and residential guest rooms, in a hospital room, people are constantly coming and going from the room to provide medical services. *Cf. Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978) (relying on the fact that the defendants could not exclude others from certain parts of a car in finding no legitimate expectation of privacy). And although Mattox rightly observes that there is a significant privacy interest in medical care, this interest is diminished in Minnesota for patients with gunshot wounds because the law requires the reporting of gunshot wounds. *See* Minn. Stat. § 626.52, subd. 2.

We conclude that Mattox did not have an objectively reasonable expectation of privacy in his hospital room and thus the officer did not violate his Fourth Amendment rights by entering the room. Because the officer lawfully entered his hospital room and his clothes were in plain view, Mattox's Fourth Amendment rights were not violated.

## B.

Next, we consider whether Mattox's statements to the police while in the hospital were voluntary. Mattox does not argue that a custodial interrogation occurred. A statement made outside of a custodial interrogation may be suppressed if it is not made voluntarily. *See United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Vega*, 676 F.3d at 718. "We determine if a defendant's will has been overborne by examining the totality of

the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." *Brave Heart*, 397 F.3d at 1040. "The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary." *Vega*, 676 F.3d at 718.

Mattox argues that the statements were involuntary because he was in the hospital recovering from gunshot wounds, he had taken pain medication, the police executed a warrant to obtain a DNA sample, and he was not read *Miranda* rights. We disagree. The totality of the circumstances shows that law enforcement did not overbear Mattox's will. *See Brave Heart*, 397 F.3d at 1040. Being on pain medication does not show that a defendant's will has been overborne if there is evidence that the patient answered "reasonably" and understood what was occurring. *See United States v. Annis*, 446 F.3d 852, 856 (8th Cir. 2006). The court noted that the officer testified "that Mattox answered questions in an appropriate context and manner; Mattox spoke in a normal cadence and pace; Mattox did not slur his words; and that [the officer] was able to totally understand Mattox's answers." Mattox also refused to answer some of the officer's questions, which suggests that the pain medication did not impair his ability to resist police pressure. *See Brave Heart*, 397 F.3d at 1040. The court also found "that there is nothing in the present record to indicate that [the police officers] employed any strong-arm tactics, deceptive strategems or other coercive acts . . . and made no threats or promises while talking to Mattox." The interview lasted only a few minutes and *Miranda* warnings were not required because Mattox was not in custody. *See United States v. New*, 491 F.3d 369, 374 (8th Cir. 2007). After considering the totality of the circumstances, we conclude that Mattox's statements were voluntary.

## III.

Next, Mattox challenges the sufficiency of the evidence that the gun had been in or affected interstate commerce. "In reviewing the sufficiency of the evidence on appeal, the relevant question is whether, after viewing the evidence in the light most

-6-

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Raines*, 243 F.3d 419, 422 (8th Cir. 2001) (internal quotation marks omitted).

To show a violation of § 922(g), the Government needed to prove beyond a reasonable doubt that Mattox's firearm had been "in or affecting interstate commerce," *United States v. Burning Breast*, 8 F.4th 808, 812 (8th Cir. 2021), which requires "prov[ing] that there exists the minimal nexus that the firearm has been, at some time, in interstate commerce," *United States v. Horsman*, 114 F.3d 822, 826 (8th Cir. 1997) (internal quotation marks and brackets omitted). At trial, expert witness Special Agent Bryan Lervoog testified that the Desert Eagle handgun found in the parking lot was manufactured in Israel and was stamped with "IMI, Made in Israel." Mattox argues that this testimony was insufficient because Lervoog also testified that the gun was designed and possibly assembled in Minnesota and that the barrel was manufactured in Minnesota, though the "frame and other parts of the firearm [we]re made in Israel." The definition of a "firearm" includes "the frame or receiver of any such weapon," 18 U.S.C. § 921(a)(3)(B), so even if the barrel was manufactured in Minnesota, testimony that the frame and other parts were manufactured in Israel and that the gun was assembled in Minnesota is sufficient to show that the gun had been in interstate commerce. *See Carter*, 270 F.3d at 734; *United States v. Cox*, 942 F.2d 1282, 1286 (8th Cir. 1991) ("[P]roof that the firearm was manufactured outside the state of possession will suffice [to prove an interstate nexus].").

## IV.

Mattox also challenges the application of a four-level sentencing enhancement for "us[ing] or possess[ing] any firearm or ammunition in connection with another felony offense," here, aggravated assault. *See* U.S.S.G. § 2K2.1(b)(6)(B). "We review the district court's finding that [the defendant] possessed a firearm in connection with another felony for clear error." *United States v. Robison*, 759 F.3d 947, 949 (8th Cir. 2014). We review the district court's application of the guidelines

*de novo*. *United States v. Canamore*, 916 F.3d 718, 721 (8th Cir. 2019). Mattox challenges the district court's conclusion that he committed aggravated assault because he claims he acted in self-defense.

"In applying § 2K2.1(b)(6) when the defendant has not been convicted of another state or federal felony offense, the district court must find by a preponderance of the evidence that another felony offense was committed, and that use or possession of the firearm facilitated that other felony." *United States v. Boman*, 873 F.3d 1035, 1043 (8th Cir. 2017) (internal quotation marks omitted). At issue here is only whether "another felony offense was committed." *See id.* "The Guidelines define 'another felony offense' as 'any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained.'" *Id.* at 1044 (quoting U.S.S.G. § 2K2.1, cmt. n.14(C)). The government must prove that another felony was committed by a preponderance of the evidence, *United States v. Raglin*, 500 F.3d 675, 677 (8th Cir. 2007), and it must negate an affirmative defense by a preponderance of the evidence, *Robison*, 759 F.3d at 949-50.

Here, the presentence investigation report recommended applying the enhancement based on Minnesota Statutes § 609.222, subdivision 1, which makes it a crime to "assault[] another with a dangerous weapon." *See State v. Montalvo*, 324 N.W.2d 650, 651 (Minn. 1982) (citing § 609.222 for "aggravated assault in the second degree"). A "firearm" is a dangerous weapon. Minn. Stat. § 609.02, subd. 6. Minnesota's self-defense affirmative defense provides that "reasonable force may be used upon or toward the person of another without the other's consent . . . when used by any person in resisting or aiding another to resist an offense against the person." Minn. Stat. § 609.06, subd. 1(3).

> A valid claim of self-defense requires the existence of four elements: (1) the absence of aggression or provocation on the part of the defendant; (2) the defendant's actual and honest belief that he was in imminent danger of death or great bodily harm; (3) the existence of

reasonable grounds for that belief; and (4) the absence of a reasonable possibility of retreat to avoid the danger.

*State v. Radke*, 821 N.W.2d 316, 324 (Minn. 2012).

The district court did not clearly err in finding that Mattox did not act in self-defense. Although it did not specify which element of self-defense was lacking, the district court concluded that "the evidence clearly shows that that four-level enhancement should be imposed, given the facts that were established at trial." At trial, the Government presented video surveillance footage of the parking-lot encounter between Mattox and two individuals. The video shows Mattox exit the apartment building, approach a male and a female at the back of an SUV in the parking lot, draw a firearm, and take a shooting stance. After Mattox drew his gun, the male also took a shooting stance and appeared to shoot at Mattox. Mattox never denied during his testimony that he was the first one to appear ready to shoot. Rather, he testified that he raised his cell phone clip to make it look like a gun after the two individuals allegedly said, "There he is. Kill him! Kill him!" From the facts established at trial through Mattox's testimony and the video of the incident, we infer that the district court found one or more of the first three elements of the self-defense affirmative defense, each of which rests on the truthfulness of Mattox's testimony, not satisfied. This finding was not clear error because the district court apparently found Mattox's version of what happened not credible. *See United States v. Mitchell*, 2 F.4th 786, 789 (8th Cir. 2021) (stating that a district court's credibility determinations "are virtually unreviewable on appeal"). Thus, we conclude that the Government has met its burden to negate Mattox's defense and that the district court did not clearly err by applying the four-level enhancement.

## V.

Lastly, the Government challenges the district court's determination that Mattox does not qualify as an armed career criminal. We review *de novo* whether a

prior conviction qualifies as a predicate offense under § 924(e)(1). *United States v. Abbott*, 794 F.3d 896, 897 (8th Cir. 2015).

The Armed Career Criminal Act (ACCA) establishes a minimum sentence for a defendant who has three prior convictions for a violent felony or a serious drug offense "committed on occasions different from one another." 18 U.S.C. § 924(e)(1). The sentencing court determines whether the offenses were committed on different occasions. *See United States v. Harris*, 794 F.3d 885, 887 (8th Cir. 2015).

Here, the Government presented evidence of three prior Minnesota convictions: (1) a second-degree assault conviction from 2012, (2) a domestic assault conviction from 2015, and (3) a fifth-degree assault conviction from 2015. The only information that the Government provided about the 2015 convictions was the charging document, which included the counts and the statement of probable cause detailing what happened based on the officers' accounts and witness statements. The district court needed to determine whether the domestic assault and fifth-degree assault convictions occurred on different occasions. In making its determination, it considered witness statements from the probable-cause portion of the criminal complaint and ultimately concluded that the domestic assault and fifth-degree assault convictions did not occur on different occasions.

On appeal, Mattox argues that we may affirm on the alternative ground that the district court cannot consider any information besides the elements of the offense of conviction and that the elements themselves are insufficient to prove that he committed the crimes on different occasions.[2] *See United States v. Baez*, 983 F.3d 1029, 1041 (8th Cir. 2020) ("[W]e can affirm the district court's judgment on any

_____

[2]The Government does not argue that if the district court could not consider the probable-cause section of the complaint, it erred in concluding that the offenses were committed on the same occasion. *See United States v. Rice*, 699 F.3d 1043, 1050 (8th Cir. 2012) ("Issues not raised in a party's opening brief are waived.").

ground that is supported by the record."). Mattox gives two reasons for why the district court cannot consider any information besides the elements and the fact of conviction. First, Mattox argues that the district court can never consider any facts besides the fact of conviction and the elements of the offense under the Sixth Amendment. Second, Mattox argues that *Shepard v. United States*, 544 U.S. 13 (2005), barred the district court from considering the probable-cause section of the complaint. If the district court could not consider the probable-cause section of the complaint, it could consider only the elements themselves and the fact of conviction because that was the only other evidence presented by the Government.

We conclude, however, that we need not reach either question. *Cf. Levering v. United States*, 890 F.3d 738, 741 n.2 (8th Cir. 2018) (refraining from deciding whether "a sentencing court deciding the occasions-different question is limited to consulting judicial records of the type described in *Shepard*"). Even assuming that *Shepard* permits the district court to consider the probable-cause section of the complaint and that the district court can consider nonelemental facts,[3] the district court did not err in determining that Mattox did not commit the crimes on different occasions.

In making this determination, the sentencing court must consider "(1) the time lapse between offenses, (2) the physical distance between their occurrence, and (3) their lack of overall substantive continuity, a factor that is often demonstrated in the violent-felony context by different victims or different aggressions." *United States v. Pledge*, 821 F.3d 1035, 1038 (8th Cir. 2016). "The first factor is the most important consideration." *Id.*

As the Government itself notes, the probable-cause section of the complaint indicates that Mattox assaulted his girlfriend, R.R.O., in her apartment, she escaped and ran to a different apartment down the hall, and Mattox chased after her. First,

---

[3]We have previously considered facts that are nonelemental, though we have not expressly said we were doing so. *See, e.g.*, *United States v. Perry*, 908 F.3d 1126, 1131-32 (8th Cir. 2018); *Levering*, 890 F.3d at 741.

-11-

there was hardly any time lapse between the two assaults. After Mattox assaulted R.R.O, he chased her as she ran into a neighbor's apartment, and while trying to get into the neighbor's apartment, he assaulted three other persons.  This factor weighs in Mattox's favor. Second, the assaults occurred in different places—R.R.O.'s apartment and in a neighbor's apartment.  Though they were close, "a short distance can be enough to separate two crimes." *Perry*, 908 F.3d at 1131.  This factor weighs in the Government's favor.  Third, the assaults had different victims, but the assaults did not reflect "different aggressions." *See Pledge*, 821 F.3d at 1038.  Mattox assaulted the three other persons in an attempt to continue his assault on R.R.O., *see United States v. Hamell*, 3 F.3d 1187, 1191 (8th Cir. 1993) (treating whether two assaults "had different motivations" as relevant to whether they were committed on separate occasions), and there was no "discernible pause in activity during which [Mattox] had an opportunity to cease and desist from further criminal activity," *see United States v. Davidson*, 527 F.3d 703, 710 (8th Cir. 2008), *vacated in part on other grounds*, 551 F.3d 807 (8th Cir. 2008).  Because there were different victims but the same aggression, the third factor does not weigh in either party's favor.  In sum, one factor weighs in each party's favor, and the most important factor weighs in Mattox's favor.  Thus, even assuming the district court properly considered the probable-cause section of the complaint and nonelemental facts, it did not err in concluding that Mattox committed the assaults on the same occasion and that Mattox does not qualify as an armed career criminal.

## VI.

For the foregoing reasons, we affirm.

_____